# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

FRANCISCO A. MATEO MD, INC. et al.,

Plaintiffs-Appellees/
Cross-Appellant,

v.

NICHOLAS G. PROIA ET AL,

Defendants-Appellants/
Cross-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 22 MA 0053, 22 MA 0054**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2017 CV 01404

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Judges and Mary Jane Trapp, Judge of the
Eleventh District Court of Appeals, Sitting by Assignment.

---

**JUDGMENT:**
Affirmed in part; Reversed in part.

---

*Atty. Timothy H. Hanna,* Hanna Rasnick Evanchan Palmisano Hobson & Fox LLC, 388 South Main Street, Suite 402, Akron, Ohio 44311 for Plaintiff-Appellee/Cross-Appellant Francisco A. Mateo MD, Inc. and

*Atty. Melissa Z. Kelly*, Tucker Ellis LLP, 950 Main Ave., Suite 1100, Cleveland, Ohio 44113, and *Atty. Thomas J. Wilson,* Comstock, Springer & Wilson Co*., LPA, 100 Federal

Plaza East, Suite 926, Youngstown, Ohio 44503 for Defendants-Appellants/Cross Appellees Nicholas G. Proia, M.D. and Nicholas G. Proia, M.D., Inc. and *Atty. Tim Tusek,* 945 Windham Court, Suite 3, Boardman, Ohio 44512 for Defendant/Cross-Appellee Tammy Proia.

Dated: October 26, 2023

---

**Robb, J.**

{¶1} Defendants-Appellants Nicholas G. Proia, M.D. and Nicholas G. Proia, M.D., Inc. (Proia Inc.) appeal the judgment entered against them in the Mahoning County Common Pleas Court after a jury trial. Appellants set forth eight assignments of error. We conclude Appellants have failed to show reversible error. We hereby affirm the parts of the judgment challenged in their appeal.

{¶2} Plaintiff-Appellee Francisco A. Mateo, M.D., Inc. (Mateo Inc.) filed a cross-appeal due to the JNOV entered in favor of Cross-Appellee Tammy Proia and the related granting of a new trial to Appellants on damages with a remittitur. The jury awarded Mateo Inc. damages against Mrs. Proia due to her improper receipt of funds from the partnership as a result of Appellants' conduct. Part of the joint and several damages the jury awarded against Appellants was likewise attributable to this amount. Based on jury interrogatories on the statute of limitations for certain torts, the trial court eliminated the award against Mrs. Proia and found the corresponding portion of the award entered against Appellants was also negatively affected.

{¶3} We hereby affirm the trial court's judgment eliminating the award against Mrs. Proia but reverse the decision to eliminate part of the award entered against Appellants. Accordingly, the jury verdict rendered against Appellants (Dr. Proia and Proia Inc.) is reinstated.

STATEMENT OF THE CASE

{¶4} Dr. Mateo started practicing medicine with Dr. Proia at Proia Inc. in 1998. Dr. Mateo formed Mateo Inc. Each physician was the sole shareholder, officer, and director of their respective S corporation. Dr. Proia offered to sell half of his practice to Mateo Inc. In 2000 or 2001, they formed the partnership Associates in Pulmonary Medicine (APM), with Proia Inc. and Mateo Inc. as the two partners. In 2016, Dr. Mateo

discovered Mateo Inc. had not been receiving half of the profits due to various irregularities. They agreed to dissolve the partnership, effective April 1, 2017.

**{¶5}** Mateo Inc. then filed suit against Proia Inc., Dr. Proia, and Mrs. Proia. (6/6/17 Comp; 8/14/17 Amd.Comp.). In pertinent part, the complaint alleged Proia Inc. or Dr. Proia directed unauthorized salary and retirement benefits to be paid from APM to Mrs. Proia from 2006 to 2015 and directed the partnership to transfer less funds to Mateo Inc. than to Proia Inc., as a result of submitting Dr. Proia's personal expenses for payment by APM.

**{¶6}** The complaint contained tort claims for conversion, fraudulent transfer, fraud, and civil conspiracy. It also presented claims for accounting, recoupment, or dissolution and breach of the partnership agreement, among other claims. The answer contained a counterclaim and alleged Mateo Inc. was the partner who received excess distributions.

**{¶7}** APM was originally named as an additional plaintiff. However, the claims asserted by APM were dismissed on motion of the defense after the court found the lawsuit was not authorized by the partnership. (11/9/21 J.E.). At the same time, the court denied summary judgment motions filed by the defense against Mateo Inc. The case was tried to a jury with a different trial judge in December of 2021.

**{¶8}** At trial, Mrs. Proia testified payments to her from APM's funds only should have been expended for hours she reported and only at rates of $11 to $12 per hour. (Tr. 126). In general, she spent a few hours per month rewriting information on patients her husband saw at the hospital and submitting it to APM for processing; occasionally, she filled in at the office if someone called off sick. (Tr. 125, 145, 153, 428-431). However, she was additionally receiving an annual salary from APM (in the mid-$80,000's).

**{¶9}** It was stipulated she erroneously received this annual salary from APM from 2006-2016, which should have been paid by Proia Inc. (Tr. 120, 127, 131); (Pl.Ex. 24). Other evidence indicated her salary was also paid by APM in 2005 while she received an hourly wage from Proia Inc. (Tr. 114-118). From 2001-2004, Mrs. Proia received a salary from Proia Inc., as evidenced in W-2s. (Pl.Ex. 21).

**{¶10}** It also was stipulated the contributions to Mrs. Proia's pension should not have been made by APM. (Tr. 132-134). Mrs. Proia received pension contributions from Proia Inc. until 2007 when APM started paying her contributions. She claimed she never

noticed her employer was changed to APM until the issue was raised by Dr. Mateo in December 2016. (Tr. 112-113, 135). Her pay was directly deposited into a joint account owned by herself and Dr. Proia; however, in addition to a W-2 showing the employer's name, each employee received a paystub on payday. (Tr. 129, 166).

{¶11} A longtime employee who performed billing and bookkeeping testified she was hired by the two doctors to work for Proia Inc. in 1999. She provided financial information to the accountants and a payroll company. Dr. Proia signed the checks she presented to him, such as for pension contributions. (Tr. 148, 170-171). She paid expenses out of APM's account if Dr. Proia instructed her to do so. (Tr. 171).

{¶12} This employee noted Mrs. Proia did not receive a salary from Proia Inc. until 2001. (Tr. 165). She believed the company changed names to APM for tax purposes. (Tr. 143). She said Mrs. Proia's salary started being paid by APM when other employees started being paid by APM, attributing the change to the accountants. (Tr. 160, 165). She explained Dr. Mateo saw a binder on her desk with information she received from the payroll company and seemed shocked to discover Mrs. Proia was being paid by APM. (Tr. 163).

{¶13} Dr. Proia testified he hired Dr. Mateo to work for him in 1998 and later allowed Dr. Mateo to buy into his practice for $168,000, stating this represented the amount of assets the practice owned on a certain date. (Tr. 1030-1032). He agreed they established APM so each partner would receive half of the profits but claimed salary was to be partly based on productivity. (Tr. 1038-1039). He believed a written partnership agreement was signed by Dr. Mateo but could not find a signed copy. (Tr. 120-1022).

{¶14} Dr. Proia said Accountant 1 advised him to use part of his income to put Mrs. Proia on the payroll so he could establish a pension for her. (Tr. 236, 1058-1059). He acknowledged she should not have been paid the salary and pension from APM, stating he did not know why the "mistake" happened. (Tr. 239-242, 1057, 1073-1080). They repaid the 2016 payments soon after Dr. Mateo raised the issue at the December 2016 annual meeting. (Tr. 240, 372-373, 1080).

{¶15} During questioning related to the first element of corporate veil piercing, Dr. Proia acknowledged a 2016 financial statement he instructed his accountant to prepare to obtain a loan listed personal assets that were elsewhere expensed to Proia Inc. (such as Ferraris, a plane, and a lake house); this financial statement also said Mrs. Proia was

APM's office manager. (Tr. 214-216, 231-234, 251, 1078-1079). From Proia Inc., Dr. Proia also paid salaries to his children (beginning when they were nine and fourteen years old), paid for his daughter's flying lessons, and provided funds to a chocolate company Dr. Proia owned. (Tr. 249-251, 261). Related to a damage setoff, Dr. Proia testified he spent approximately $23,000 in bookkeeping and storage fees in closing APM. (Tr. 1097-1098).

{¶16} The plaintiff's expert opined Mateo Inc. was owed $1,070,545 plus $830,457 in interest for a total of $1,901,002. Although he believed the doctors began their venture in 2000, he started his damages evaluation with 2001. (Tr. 283, 298, 314); (Pl.Ex. 21). Because APM was being run through Proia Inc.'s books in the beginning, the plaintiff's expert used these books when calculating unauthorized payments to Mrs. Proia and personal expenses paid on behalf of Dr. Proia. (Tr. 298-302, 333, 349, 363). He noted pension contributions were made for Dr. Proia from Proia Inc. and then from APM, whereas Dr. Mateo contributed to his own pension *after* partnership funds were distributed to Mateo Inc. (until APM began contributing for both doctors in 2009). (Tr. 310, 379).

{¶17} Dr. Mateo testified that after working for Proia Inc. in 1998 and 1999, he bought into the practice based on a valuation performed by Dr. Proia's accountant (Accountant 1). (Tr. 409). Dr. Mateo explained Proia Inc. had accounts receivable based on loans for Dr. Proia's personal items (such as other companies and a plane) but the valuation specifically showed these items were excluded from the new venture. (Tr. 412). Dr. Mateo said they formed a 50/50 partnership at the end of 1999 or beginning of 2000. (Tr. 409, 421).

{¶18} He indicated they originally operated the company through Proia Inc. before the paperwork was complete for APM. (Tr. 410, 535, 594, 601-602, 637-639). Dr. Mateo pointed out the employees of their new partnership practice were on the payroll of Proia Inc. from 2001 until the transition was fully complete in 2006. (Tr. 536). A letter from Accountant 1 said it was to confirm Dr. Mateo was buying 50% of a corporation. (Pl.Ex. 51). One aspect of the delay involved Accountant 1's incarceration. (Tr. 536, 578).

{¶19} Dr. Mateo said the Proias were like family to him; Mrs. Proia was his child's godmother, and they spent holidays together. (Tr. 431-437). Everything seemed to be going smoothly, until Dr. Proia considered suing Dr. Mateo for breach of contract after Dr.

Mateo declined an offer to be involved in a new program at a hospital, which would have required long hours. (Tr. 442-456, 548-551, 618-620). Dr. Mateo thereafter made inquiries at the office, and in June of 2016, discovered Mrs. Proia was on the payroll. (Tr. 554). In September of 2016, he received confirmation from the pension representative that APM had also been contributing to a pension for Mrs. Proia. (Tr. 559). During his investigations, he also discovered personal expenses Dr. Proia received during the early years (from Proia Inc. whose books he said were being used by APM). He pointed out Dr. Proia acknowledged at the December 2016 annual meeting that his wife should not have received a salary (with a pension) from APM. (Tr. 563).

{¶20} Dr. Mateo testified they never signed the "draft" agreement referred to in the letter from Accountant 1, stating he refused to sign a 40-page agreement drafted by Dr. Proia's lawyer because he previously worked in a practice with 12 doctors under an agreement that was only four pages. (Tr. 45, 418). He said the payments to the partners were not based on productivity, emphasizing worksheets showing they had a similar number of patient encounters. (Tr. 424). It was noted Dr. Proia's April 2016 letter said they should proceed under the uniform partnership law since no signed agreement was found. (Tr. 575).

{¶21} Accountant 1 testified his criminal convictions were for using client funds. He helped Dr. Proia set up his corporation and later did the valuation to determine the cost for Dr. Mateo to buy half of the practice and become a partner in a joint operation. (Tr. 746-752, 778). He was asked about Proia Inc. being used to run the partnership business in the early years with reference to a heading "Proia Inc. dba APM" and Dr. Mateo's receipt of "shareholder" distributions from Proia Inc. in 2001. He confirmed the partnership initially ran its books under Proia Inc. (Tr. 794-798).

{¶22} Accountant 2 was utilized by the doctors after Accountant 1 was incarcerated. Although Proia Inc. was used to pay retirement plans for various employees, this accountant noticed these payments were listed as a deduction on APM's 2004 tax return. (Tr. 823). As for the contested figures in the capital accounts on APM books, he was unsure how the prior accountant arrived at the amount in Proia Inc.'s capital account; he merely carried it forward from the past without investigating the matter.

{¶23} Accountant 3 bought the accounting practice from Accountant 2 in mid-2015. He prepared the 2016 financial statement for the Proias to obtain a loan. (Tr. 500-

504). Dr. Mateo called him in September of 2016 to inquire about Mrs. Proia's pension. (Tr. 479). This accountant attended the year-end meeting and heard Dr. Proia acknowledge the mistake. (Tr. 483, 486). He said the profit-sharing appeared equal in past documents but opined a worksheet in 2015 suggested a productivity element to the division of profits because they listed the number of patients and revenue. (Tr. 471, 512-518).

**{¶24}** A pension representative testified he received the information for pension plan contributions from the accountants. (Tr. 897, 919). He said six employees, including Mrs. Proia, were provided pension contributions from Proia Inc. in 2001; this continued through 2006. (Tr. 896, 900). In the pension records, Proia Inc. changed to APM beginning in 2007. (Tr. 902, 944). It was noted tax returns show APM made pension contributions in 2003 using Proia Inc.'s federal identification number. (Tr. 933, 936). Due to 2009 rule changes, one arm of the pension was eliminated; at that time, APM started contributing to a pension for Dr. Mateo (as it had been for Dr. Proia). (Tr. 904-906). The pension representative said Dr. Proia was the plan fiduciary and signed checks. (Tr. 910-911).

**{¶25}** An expert utilized by the defense opined Mateo Inc. received $332,230 more than Proia Inc. Her calculation relied on the carried-forward capital account figures and said if an adjustment were required due to an initial irregularity in the original accounting, then each partner's account should contribute to the adjustment. (Tr. 967-975). In reaching her conclusions, she did not factor in the contested personal expenses or the payments to Mrs. Proia. (Tr. 988-989, 994).

**{¶26}** The jury returned a verdict in favor of Mateo Inc. in the amount of $1,855,334 against Dr. Proia and Proia Inc., jointly and severally, and in the amount of $828,918 against Mrs. Proia. (12/22/21 J.E.). The jury rejected the counterclaim filed against Mateo Inc. (12/30/22 J.E.).

**{¶27}** Mateo Inc.'s interrogatories separately inquired about the claims for accounting, conversion, fraudulent transfer, fraud (as to Proia Inc. and Dr. Proia), and civil conspiracy (as to Mrs. Proia). The answers show the jury found liability and the same amount of damages on each of these claims. However, there were issues with the answers to certain interrogatories propounded by the defense. Interrogatory 4 asked the jury when Mateo Inc. through reasonable diligence should have discovered the salary

and pension payments were made to Mrs. Proia, and the jury answered, "End of calendar year 2001."

**{¶28}** Interrogatories 7 through 13 corresponded to the jury instructions on the elements of fraud. The jury found Proia Inc. concealed from Mateo Inc. a material fact with the intent of misleading Mateo Inc. into relying on the concealment, Mateo Inc. relied on the concealment, and Proia Inc. had a duty to disclose the concealed fact. However, interrogatory 11 showed the jury did not find "by a preponderance of the evidence that Mateo Inc. was justified in relying on the concealment."

**{¶29}** After these questions, the jury answered "No" to interrogatory 14 (the final interrogatory), which asked if they found by a preponderance of the evidence that Mateo Inc. acted reasonably in failing to investigate or inquire into the circumstances of the payroll prior to the date Mateo Inc. discovered the circumstances.

**{¶30}** A discussion was apparently held off the record, as the court returned to the record with a recap of the parties' arguments on the answers from interrogatories 4 and 11. (Tr. 1330, 1333). The defense argued the answers affected all the tort claims and said, "anything involving Tammy Proia and her salary was inextricably interwoven." (Tr. 1331).

**{¶31}** Mateo Inc. acknowledged the answers eliminated the claims for fraud and conspiracy to commit fraud and resulted in Mrs. Proia being eliminated from the next stage (where the jury would be asked whether punitive damages were warranted). (Tr. 1332, 1334). Mateo Inc. argued the answers only affected the fraud and conspiracy to commit fraud claims, noting concealment is not an element of conversion or fraudulent transfer and pointing out the damages went beyond the salary and pension paid to Mrs. Proia. (Tr. 1333-1335).

**{¶32}** The court said it needed more time to consider the trajectory of the answers and the effect on the fraudulent conveyance and conversion claims and wanted additional argument on the subject but would be submitting the punitive damages question to the jury (noting the verdict would be tentative subject to the court's determination about the effect of the interrogatories). (Tr. 1330, 1336). The jury then found Mateo Inc. was not entitled to punitive damages and attorney fees. (12/30/22 J.E.).

**{¶33}** The Proia defendants filed a motion for JNOV and for a new trial or remittitur on various grounds. (1/19/22 Mot.). The court granted JNOV to Mrs. Proia finding the

statute of limitations precluded recovery from her based on the jury interrogatory on the reasonableness of Mateo Inc.'s discovery of the payments to her. Observing the $828,918 award against Mrs. Proia was necessarily jointly contained in the award against the other two defendants, the court therefore believed the damage against Dr. Proia and Proia Inc. should be reduced by this amount (to $1,026,416). The court offered a new trial on damages unless Mateo Inc. accepted remittitur in this amount. (4/21/22 J.E.). Mateo Inc. accepted the remittitur amount in lieu of a new trial on damages. (4/26/22 J.E.).

{¶34} Dr. Proia and Proia Inc. (Appellants) nevertheless appealed the judgment. Mateo Inc. then cross-appealed. Briefing was not complete until April 2023.

<u>ASSIGNMENT OF ERROR ONE</u>

{¶35} Appellants' first assignment of error provides:

"The trial court erred when it entered judgment in favor of Plaintiff-Appellee on its tort claims for amounts arising out of conduct that occurred outside the applicable statutes of limitation because the jury determined that those claims were not timely."

{¶36} The statute of limitations for conversion and fraudulent conveyance is four years with a discovery rule, just as it was for the fraud claim. Specifically, a claim for relief for a fraudulent transfer under R.C. 1336.04(A)(1) is "extinguished" unless the action is brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or reasonably could have been discovered by the claimant * * *." R.C. 1336.09(A).

{¶37} After setting forth a four-year statute of limitation for "the recovery of personal property, or for taking or detaining it," the statute related to conversion (and fraud) provides the following codification of the discovery rule: "If the action is * * * for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered." R.C. 2305.09(B),(E). "[T]he four-year limitations period does not commence to run on claims presented in fraud or conversion until the complainants have discovered, or should have discovered, the claimed matters." *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 546 N.E.2d 206 (1989). "Under the discovery rule, the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have

discovered a possible cause of action." *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 849 N.E.2d 268, 2006-Ohio-2625, ¶ 21.

{¶38} Between this assignment of error and their vague final assignment of error on their JNOV request, Appellants essentially contend that in addition to eliminating the damage award relevant to Mrs. Proia, the trial court should have eliminated other damages, claiming other conduct was found to have occurred outside of the four-year statute of limitations. Based on their construction of a jury interrogatory, Appellants argue the jury found Mateo Inc. could not rely on the discovery rule for the other alleged conduct constituting the conversion and fraudulent transfer claims. They claim this was the result of the trial court's failure to properly account for the effect of interrogatory 14. They cite a case finding plain error in comparing jury interrogatories but insist they timely objected here. *See O'Connell v. Chesapeake & Ohio R. Co.*, 58 Ohio St.3d 226, 569 N.E.2d 889 (1991).

{¶39} Mateo Inc. argues interrogatory 14 did not broadly address the statute of limitations but was a continuation of questions on the elements of fraud and conspiracy to commit fraud (wherein the jury found Mateo Inc. was not justified in relying on the concealment), claiming it had no relation to the other claims. Mateo Inc. also asserts Appellants waived the argument on appeal by not specifically citing the interrogatory upon which they now rely and by failing to request a jury clarification before the jury was discharged. Mateo Inc. points out civil plain error is not a favored doctrine and can be utilized only in an extremely rare case involving exceptional circumstances where the error seriously affects "the basic fairness, integrity or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *See Gable v. Gates Mills*, 103 Ohio St.3d 449, 816 N.E.2d 1049, 2004-Ohio-5719, ¶ 43, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122-123, 679 N.E.2d 1099 (1997).

{¶40} The *O'Connell* case cited by Appellants does not support their position. It discussed inconsistent jury interrogatories where there were insufficient juror signatures since some jurors found no liability then apportioned fault; the Court's analysis involved whether to adopt the "same juror" rule or the "any majority" rule in this state. *O'Connell*, 58 Ohio St.3d at 232-237. It also involved the trial court reciting interrogatories on the record before the jury was released with no mention by the court of the signature issue; the Supreme Court observed this issue would not have been realized by the parties at

the time the trial court read the interrogatories and stated the *number* of signatures. *Id.* at 229.

**{¶41}** Here, the interrogatory answers (recited in our Statement of the Case above) were read by the court on the record. The defense generally argued the answers barred recovery on the tort claims in their entirety. The court said it needed more time to consider the trajectory of the answers and the effect on the conversion or fraudulent transfer claims and asked for future argument on the subject. (Tr. 1330, 1336). The court then submitted the punitive damages question to the jury on conversion and fraudulent transfer (while informing the parties the ruling was tentative subject to the court's determination about the effect of the interrogatories).

**{¶42}** As Mateo Inc. emphasizes, the jury was still empaneled waiting to decide the issue of entitlement to punitive damages and attorney fees when the effect of the interrogatories was being discussed, and Appellants did not ask the court to further inquire of the jury. *See generally O'Connell*, 58 Ohio St.3d at 229 (indicating a party can waive an issue with inconsistent jury interrogatories if an objection was possible before the jury was discharged as having the same jury reconcile inconsistencies promotes judicial economy). Furthermore, the record shows immediate arguments to the trial court on interrogatories 4 and 11, with no mention of interrogatory 14 or its effect on Appellants' arguments. (Tr. 1329-1336).

**{¶43}** After the court later entered judgment on the verdicts, the defense sought JNOV by urging the jury found more than just Mrs. Proia's salary issues to be untimely, citing interrogatories 4 (answering Mateo Inc. was not justified in relying on the concealment) and 11 (answering Mateo Inc. should have discovered Mrs. Proia received salary and pension at the end of 2001). The trial court's resulting judgment referred to interrogatory 14 (as well as the cited interrogatories), essentially concluding the answers affected the judgment only as it related to Mrs. Proia's salary and pension. (4/21/22 J.E.). Appellants believe the court should have gone further in interpreting interrogatory 14 to eliminate the entirety of all tort claims.

**{¶44}** Pursuant to Civ.R. 49(B), if an interrogatory answer is inconsistent with the general verdict, then the court can enter judgment notwithstanding the verdict (adopting the answers), "return the jury" for further consideration, or order a new trial. A court cannot render a judgment on an interrogatory answer and against a general verdict unless

it is both inconsistent and irreconcilable with the general verdict. *Tasin v. SIFCO Industries, Inc.*, 50 Ohio St.3d 102, 105, 553 N.E.2d 257 (1990). If it is inconsistent and irreconcilable, then the court can exercise discretion to enter judgment on the interrogatory, bring the jury back to reconcile the answers (showing the importance of raising known issues before the jury is discharged), or grant a new trial. *Id.*

{¶45} Interrogatory 14 asked whether it was reasonable to fail to investigate the circumstances of the "payroll" sooner than the date of discovery. Under the circumstances of the case, a partner directing a partnership to pay personal expenses or distribute additional money on his behalf would not evoke thoughts of the payroll. Rather, the payroll issue revolved around Mrs. Proia's status on the payroll, and the jury answered Mateo Inc. should have discovered it in 2001.

{¶46} We conclude the trial court did not err in concluding the answer in interrogatory 14 was unrelated to Appellants' direct receipt of funds from the partnership and was limited to the issue with Mrs. Proia being on the payroll of the partnership. The trial court resolved that issue in favor of the three defendants, which leads to Mateo Inc.'s cross-appeal (wherein Mateo Inc. blends its arguments with those presented in response to Appellants' first assignment of error).

CROSS-APPEAL ASSIGNMENT OF ERROR

{¶47} In the cross-appeal, Mateo Inc.'s assignment of error alleges:

"The trial court abused its discretion in its April 21, 2022 Judgment by granting Nicholas and Proia, Inc.'s motion for new trial or in the alternative remittitur, erred in its April 21, 2022 Judgment by granting Tammy's motion for JNOV, and abused its discretion in its April 26, 2022 Judgment by accepting Mateo, Inc.'s remittitur in lieu of a new trial on damages and erred in its April 26, 2022 Judgment by entering judgment in Tammy's favor."

{¶48} Mateo Inc.'s cross-appeal involves the elimination of the damage award attributed to Mrs. Proia mistakenly being on APM's payroll. After the jury entered a verdict against Mrs. Proia in the amount of $828,918, the court entered JNOV in her favor based on answers to interrogatories related to the statute of limitations. The court concluded this category of damages could not be recovered from the other defendants either. Pointing out the amount involving Mrs. Proia was necessarily contained within the total damages awarded against Proia Inc. and Dr. Proia, the trial court found a new trial on

damages was warranted unless remittitur in a corresponding amount was accepted by Mateo Inc.

**{¶49}** In general, a motion for JNOV presents a question of law to be reviewed de novo after construing the evidence most strongly in favor of the verdict. *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23. As Mateo Inc. recognizes, a court can enter judgment on an interrogatory answer notwithstanding a general verdict if the answer was inconsistent and irreconcilable with the general verdict. *Tasin*, 50 Ohio St.3d at 105. *See also* Civ.R. 49(B). Alternatively, the court can exercise its discretion to "return the jury" for further consideration of its answers and verdict or order a new trial. *Id.*

**{¶50}** Mateo Inc. argues the interrogatory answers were not inconsistent and irreconcilable with the verdict against Mrs. Proia for recovery of all salary and pension payments. Claiming any ambiguity in the interrogatory should be construed against the drafting defendants, Mateo Inc. observes interrogatory 4 did not include the phrase "preponderance of the evidence" when asking when Mateo Inc. should have discovered the payments to Mrs. Proia. Mateo Inc. then argues this would account for why the jury rendered a general verdict on its claims but also found reasonable diligence required discovery of the payments to Mrs. Proia long ago, theorizing the jury made a finding on the affirmative defense of statute of limitations but did not find it was supported by the preponderance of the evidence.

**{¶51}** However, the court instructed the jury on the statute of limitations for fraud, fraudulent transfer, and conversion with the applicable discovery rules; the court also said the party asserting a claim or an affirmative defense must prove it by a preponderance of the evidence. (Tr. 1269-1270, 1295). In addressing Appellants' first assignment of error, Mateo Inc. argued the defense failed to ask the court to order the jury to reconcile their answers with their verdict, but Mateo Inc. did not ask for this either (knowing the court's decision was to proceed to the question of punitive damages was tentative).

**{¶52}** Mateo Inc. also cites the two-issue rule. Appellants and Mrs. Proia reply the rule does not apply because the general verdict was tested by special interrogatories and there was no issue with the jury instructions. The rule broadly states:

> where there are two causes of action, or two defenses, thereby raising
> separate and distinct issues, and a general verdict has been returned, and

the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues was resolved in favor of the successful party, it will be presumed that all issues were so determined; and that, where a single determinative issue has been tried free from error, error in presenting another issue will be disregarded.

*Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 185, 729 N.E.2d 726 (2000) (and then applying the rule to the context of an argument on a jury instruction and evaluating prejudice).

{¶53} Mateo Inc. concludes JNOV should not have been granted for Mrs. Proia (or carried through to the other defendants as to her payments) merely because the fraud and conspiracy to commit fraud claims were barred by the statute of limitations, stating verdicts were returned on separate and alternate claims. However, this generality does not explain why the answer to interrogatory 4 would bar recovery on one tort but not the others on the subject of the payments to Mrs. Proia. Interrogatory 11 was specific to an element of fraud, finding Mateo Inc. was not justified in relying on concealment (which Proia Inc. had a duty to disclose); counsel for Mateo Inc. invited the trial court to conclude the fraud and conspiracy claims were "gone" due to interrogatory 11 (and acknowledged they could not proceed to the punitive stage as to Mrs. Proia). In contrast, interrogatory 4's finding that Mateo Inc. should have discovered Mrs. Proia was on the payroll in 2001 was specific to a category of recovery but was not specific to one tort.

{¶54} Lastly, we address the portion of Mateo Inc.'s contention that an unfavorable conclusion as to the effect of the interrogatory answers on the tort claims would not bar recovery under the claim for winding up with an accounting. Appellants do not specifically explain within their response to the cross-appeal why the statute of limitations would affect Mateo Inc.'s accounting recovery in the same manner as it affected the tort recovery. Mrs. Proia's brief, however, does specifically address the concept as applied to her. In responding to the cross-appeal, she emphasizes she was not a partner and thus had no obligations in the winding up or settlement of accounts. The partnership statutes (such as the one on equalization of accounts or the one allowing the filing of a suit with an accounting by a partner against another partner) do not apply to her.

Case Nos. 22 MA 0053, 22 MA 0054

{¶55} The accounting sought against Mrs. Proia was incidental to the tort claims filed against her. In non-partnership contexts, appellate courts have generally concluded a claim for an accounting is a remedy rather than an independent cause of action. *Kobal v. Edward Jones Securities*, 8th Dist. Cuyahoga No. 109753, 2021-Ohio-1088, ¶ 14. "An accounting, like a constructive trust, is an equitable remedy, not a cause of action, and the claim for an accounting remedy is properly dismissed under Civ.R. 12(B)(6) [and] * * * with prejudice where it was grounded upon the time-barred allegations of [a defendant's] alleged fraud and breach of fiduciary duty." *Krohn v. Ostafi*, 6th Dist. Lucas No. L-19-1002, 2020-Ohio-1536, ¶ 37. *See also Gray v. Kerr*, 46 Ohio St. 652, 658, 23 N.E. 136 (1889) (speaking of tracing to non-bona fide purchasers transfers made "fraudulently" by the partner). We conclude the trial court did not err in finding the answers to jury interrogatories were inconsistent and irreconcilable with the verdict applicable to Mrs. Proia as they answered the underlying discovery rule question for the statute of limitations on all claims against Mrs. Proia (and not just on the conspiracy to commit fraud claim).[1]

{¶56} The situation is different when analyzing the accounting as to Proia Inc., who is Mateo Inc.'s partner. Historically, an accounting has been considered a "cause of action in favor of one partner against his copartner * * *." *Gray*, 46 Ohio St. 652 at paragraph two of the syllabus. Later, in speaking of the "the right to a formal account as to partnership affairs," the Supreme Court observed "[t]he usual and normal *remedy* for a breach of fiduciary duty or other legal conflict among partners is an accounting." (Emphasis added.) *Dunn v. Zimmerman*, 69 Ohio St.3d 304, 306-307, 631 N.E.2d 1040 (1994), syllabus (quoting former R.C. 1775.21). "The broad scope of circumstances listed in [the statute] indicates that an accounting is an appropriate *remedy* for a range of wrongs, embracing more than just breach of fiduciary duty. In the instant case, for example, the complaint contained counts for conversion and conspiracy." (Emphasis added.) *Id.* at 307 (such independent claims may be grounds for an accounting or an accounting can be conducted on dissolution). The Court explained the party seeking the accounting has the burden to introduce sufficient evidence so the court can account for the true condition of affairs between the partners and enforce collection of any amounts

---

[1] Mateo Inc.'s cross-appeal does not present an argument about the extent of the trial court's application of the statute of limitations, time-wise; i.e., the cross-appeal does not alternatively argue for partial recovery for more recent years.

Case Nos. 22 MA 0053, 22 MA 0054

found owing. *Id.* (and concluding an accounting is usually a prerequisite to an action at law that arises from the affairs of a partnership).

**{¶57}** Under the current partnership act, "A partner may maintain an action against the partnership or another partner for legal or equitable relief, *with or without an accounting* as to partnership business, to enforce [various listed rights]." (Emphasis added.) R.C. 1776.45(B).[2] The rights listed are: (1) rights under the partnership agreement; (2) rights under Chapter 1776, including the right to compel a dissolution and winding up; and (3) "rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship." R.C. 1776.45(B). Although not cited by Appellants, we note the statute concludes: "This section does not govern the accrual of, and any time limitation on, a right of action for a remedy under this section. A right to an accounting upon dissolution and winding up does not revive a claim barred by law." R.C. 1776.45(C).

**{¶58}** Appellants suggest the trial court properly eliminated the part of the recovery against Proia Inc. (and Dr. Proia) corresponding to the payments to Mrs. Proia because the accounting seemed incidental to the tort claims in this case. Although a mistake in the equalization of partnership affairs can be remedied in winding up without a tort being prosecuted, Appellants' brief (elsewhere) notes Mateo Inc. failed to "press" the breach of contract claim set forth in the complaint (as there was no specific jury instruction on breach of contract).

**{¶59}** However, Appellants do not cite R.C. 1776.45(C) or allege a non-tort statute of limitations expired, and historically, a "cause of action in favor of one partner against his copartner for an account accrues upon the dissolution of the partnership". *Gray*, 46 Ohio St. 652 at paragraphs two and three of the syllabus (and the statute of limitations may start later than at dissolution under some circumstances). Unlike Mrs. Proia's brief in response to the cross-appeal (in which she argues the accounting cannot stand against her without an accompanying claim because she was not a partner and the partnership statutes do not apply to her), the portion of Appellants' brief responding to Mateo Inc.'s cross-appeal does not argue the accounting verdict (as to Mrs. Proia's payments) is

---

[2] This "with or without an accounting" language appears to have altered *Dunn* to the extent it said the accounting was a "prerequisite" to an action at law except under certain circumstances. In any case, Appellants do not argue this principle.

Case Nos. 22 MA 0053, 22 MA 0054

dependent on the survival of the torts and would be eliminated by the tort statute of limitations.

**{¶60}** Instead, it appears Appellants are relying on their fifth assignment of error to eliminate the accounting interrogatory on all categories of damages by arguing the principles underlying the accounting claim were for a court, not a jury. They do not argue any contract statute of limitations expired (here or in their first assignment of error seeking to extend the "payroll" language in an interrogatory to all amounts at issue); instead, at a different point in the brief, they claim, in passing, that there was no jury instruction on breach of contract. Yet, their argument does not account for the implications of the jury instructions on partnership law in combination with the interrogatory entering the same verdict on the "accounting" claim (as entered on the tort claims). *See, e.g., Delville v. Firmenich Inc.*, 23 F.Supp.3d 414, 421 (S.D.N.Y.2014) (defendant-appellant did not show obvious error in failing to instruct on all contract elements where it did not include them in its proposed instruction for its own breach of contract counterclaim).

**{¶61}** The portion of the suit filed by one partner against the other partner (which was variously called an accounting, winding up and dissolution, contribution, or settlement of accounts) was not reliant on the tort claims or subject to the tort statute of limitations. The partnership books had already been handed over and evaluated by the parties and their experts, and the initial figures were in place. Regardless of whether the parties and the court called the claim submitted to the jury a claim for winding up (per the jury instructions) or a claim for an accounting (per the interrogatory), there were underlying factual questions for the jury in order to ascertain what contributions were expected as a result of one contributing more than the other partner to partnership expenses due to improper distributions to the other. In fact, the defense argued the agreement called for differing salary amounts based on profits. (Tr. 1201-1202). These observations are further discussed in the fifth assignment of error on the accounting and the sixth assignment of error on prejudgment interest.

**{¶62}** Jury instructions were provided on the duties required under partnership law relevant to the claim for "winding up," and a corresponding verdict form was provided on a claim for an accounting (separate from the tort claims). (Tr. 1282-1284, 1303). Although the partners agreed on a date for discontinuing operations, both partners agreed an accounting was required to wind up the partnership and equalize distributions, with

each claiming the other received too much over the years. Moreover, it was acknowledged at trial by Dr. Proia, Mrs. Proia, and their attorneys that Mrs. Proia was mistakenly paid by APM instead of by Proia Inc. (the partner whose owner said she was supposed to be on their own payroll). Regardless of any tort being committed, one of the partners had the salary of their S corporation employee paid by the partnership. These payments were admittedly unauthorized, with Appellants acknowledging to the jury that the payments should be reconciled. (Tr. 1208). (That same partner had personal expenses paid by the partnership.)

{¶63} We conclude the decision regarding the statute of limitations for tort claims involving payments to Mrs. Proia did not affect the recovery on the "accounting" request by the partners suing each other. The assignment of error in the cross-appeal is therefore sustained in part. Accordingly, we reverse the trial court's reduction of Mateo Inc.'s recovery under the "accounting" between the partners and reinstate the full damage award against Proia Inc. and Dr. Proia. The portion of the cross-appeal challenging the JNOV for Mrs. Proia is overruled, and the judgment eliminating the damage award against Mrs. Proia is affirmed.

ASSIGNMENT OF ERROR TWO

{¶64} Appellants' second assignment of error contends:

"The trial court erred when it allowed the jury to consider Plaintiff's claims for conversion."

{¶65} Mateo Inc. alleged the defendants converted money by receiving funds from APM in unauthorized amounts. For instance, APM was caused to pay for items on behalf of Proia Inc., including Dr. Proia's personal expenses and Mrs. Proia's pension and salary (deposited into an account jointly owned by her and Dr. Proia). (Tr. 1290). At the close of the plaintiff's case, Appellants moved for directed verdict on the conversion claim by stating they were joining the directed verdict argument made by Mrs. Proia's attorney. (Tr. 732). Her attorney had argued Mateo Inc. lacked an ownership interest in the money paid to Mrs. Proia because a partner has no interest in property belonging to the separate legal entity of the partnership, claiming it was legally incorrect to say the money belonged to Mateo Inc. merely because it represented a partner's profit interest. (Tr. 697-698). The directed verdict motion on conversion was summarily renewed at the close of all evidence. (Tr. 1159).

Case Nos. 22 MA 0053, 22 MA 0054

**{¶66}** In denying the initial directed verdict motions, the trial court denoted Mateo Inc. as the real party in interest and referred to principles of equity and forfeiture while noting the prior dismissal of APM from the case by another trial judge. (Tr. 729-730, 736-737). Mateo Inc. included APM as a plaintiff in the complaint; however, the prior judge granted Appellants' summary judgment motion and dismissed APM as a party because both partners did not agree to the partnership's act of filing the suit.

**{¶67}** "A motion for directed verdict presents a question of law on sufficiency of the evidence." *Wagner v. Roche Labs.*, 77 Ohio St.3d 116, 119, 671 N.E.2d 252 (1996). After construing the evidence most strongly in favor of the party against whom the motion is directed, the court determines if reasonable minds could only come to a conclusion adverse to such party. Civ.R. 50(A)(4).

**{¶68}** "Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990). Challenging the first element, Appellants break the tort of conversion into the following elements: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *Keybank Natl. Assoc. v. Guarnieri & Secrest, P.L.L.*, 7th Dist. Columbiana No. 07 CO 46, 2008-Ohio-6362, ¶ 15. The plaintiff need not be the owner but can have some other interest in the property; the first element includes a party with actual or constructive possession or an immediate right of possession at the time of conversion. *Estate of Alkhaldi v. Khatib*, 7th Dist. Mahoning No. 04 MA 285, 2005-Ohio-6168, ¶ 18.

**{¶69}** According to Appellants, Mateo Inc. could not satisfy the first element as a matter of law because it had no ownership interest or right to possess the property at issue, which was partnership property at the time of the alleged conversion. Claiming one partner cannot sue another partner for conversion of profits, Appellants rely on case law indicating a partner cannot commit criminal theft of partnership property. *See State v. King*, 10 Ohio App.3d 93, 95, 460 N.E.2d 1143 (10th Dist.1983), citing *Alfele v. Wright*, 17 Ohio St. 238 (1867). Notably, the *King* case relied on a former statute providing a "partner is co-owner with his partners of specific partnership property" (suggesting the theory was a partner cannot steal from himself). *Id.*, quoting R.C. 1775.24(A) and citing

R.C. 2913.01(D) (owner defined as one "who is the owner of, who has possession or control of, or who has any license or interest in property").

**{¶70}** This contrasts with the current statute, which states: "A partner is not a co-owner of partnership property and has no interest in partnership property that can be transferred, either voluntarily or involuntarily." R.C. 1776.47. *See also* R.C. 1776.23(A) ("Property acquired by a partnership is property of the partnership and not the property of the partners individually."). Still, this statute invokes a different theory. Appellants urge the statute necessarily means property wrongfully converted by one partner from the partnership is not converted *from* the other partner even if it (or half of it) would have been paid to him as a distribution of profits. Appellants conclude only the partnership (APM) had ownership or a right to possess the partnership property at issue and thus only the partnership could sue for conversion.

**{¶71}** In addition to noting the attempted suit by APM, Mateo Inc. argues once APM paid the money to the Proia defendants instead of paying Mateo Inc. its half share, Mateo Inc. became the deprived party (especially where APM had no money left). Mateo Inc. emphasizes the following provisions: "Each partner is entitled to an equal share of the partnership profits"; each is "deemed to have an account" to be credited with amounts including profits; and "A partner may use or possess partnership property only on behalf of the partnership." R.C. 1776.41(A),(B),(G).

**{¶72}** Division (A) of R.C. 1776.45 states: "A partnership may maintain an action against a partner for a breach of the partnership agreement or for the violation of a duty to the partnership, causing harm to the partnership." However, division (B) then states, "*A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business*, to enforce" various listed rights. (Emphasis added.) R.C. 1776.45(B).

**{¶73}** As set forth above, this list includes rights under the partnership agreement and rights under Chapter 1776 (including dissolution and winding up). *Id. See also* R.C. 1776.63(C) ("A person winding up a partnership's business may * * * prosecute and defend actions and proceedings, whether civil, criminal, or administrative * * * and perform other necessary acts"). Division (B) of R.C. 1776.45 also allows a partner to sue the partnership or another partner for enforcement of: "The rights and otherwise protect the

interests of the partner, including rights and interests arising independently of the partnership relationship."

**{¶74}** It is not unusual for one partner to file a tort suit against another partner for conversion. *See e.g., Dunn*, 69 Ohio St.3d at 307; *Gevedon v. Decker*, 2d Dist. Clark No. 2020-CA-21, 2021-Ohio-77, ¶ 29 (one partner sued other partner and his wife for conversion for using partnership money on personal expenses over the years, including for their residence and to buy inventory for their new competing business); *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 282, 741 N.E.2d 155 (2d Dist.2000) (one partner recovered against his fellow partners individually for conversion of a portion of his partnership interest due to certain partnership decisions).

**{¶75}** Although the question in *Dunn* involved whether "breach of fiduciary duty among partners is actionable at law" without being preceded by an accounting, the Supreme Court explained: "an accounting is an appropriate remedy for a range of wrongs, embracing more than just breach of fiduciary duty. In the instant case, for example, the complaint contained counts for conversion and conspiracy. Depending on the specific facts of the case, such independent claims may be grounds for an accounting * * *." *Dunn*, 69 Ohio St.3d at 307. As noted in footnote 2 above, a subsequent statute says an accounting is not a prerequisite. In any event, Appellants are not arguing an accounting is a prerequisite to a conversion action; rather, they are arguing a partner can never establish an interest in converted property for purposes of the first element of conversion.

**{¶76}** Collecting historical reasons for precluding a partner from suing a fellow partner for theft-like behavior, the Supreme Court of North Carolina once explained one partner could not "ordinarily" sue the other "during the continuance of the partnership" for a legal tort involving the partnership's property because one partner did not have more rights to deal with the property than the other and an accounting was first required to determine the proportion of the assets belonging to each partner; however, even then, one partner could sue the others if the property was destroyed or entirely removed from the complaining partner's control. *Pugh v. Newbern*, 193 N.C. 258, 136 S.E. 707, 708 (1927). In listing other exceptions to the general rule, the court concluded such a tort suit was permissible "[w]hen the joint property has been wrongfully destroyed or converted" and "[w]hen one partner has been guilty of fraud in contracting the debt or in incurring the

obligation or by concealing the property or by other device defeating the rights of the complaining party." *Id.* at 708-709 (another exception was the uncomplicated finance exception mentioned in *Dunn*).

**{¶77}** In Ohio partnership law, an economic interest is defined as "a partner's share of the profits and losses of a partnership and the partner's right to receive distributions." R.C. 1776.01(F). "The economic interest is personal property." R.C. 1776.48 (and is his only transferable interest in the partnership). Here, the partnership was not continuing, they agreed on an end date prior to the filing of the suit, the profits were entirely removed from the complaining partner's control, claims for fraud and conversion were alleged in addition to winding up and accounting, both partners were seeking an accounting, each claimed money was owed by the other, and the defending partner objected to the partnership as a plaintiff in the action. Under the circumstances of this case, we conclude Mateo Inc. satisfied the first element of conversion by establishing an interest in the property at issue with constructive possession or a right to possession of half of the property at the time the unauthorized payments were made. The trial court did not err in refusing to direct a verdict for Appellants on the conversion claim. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE

**{¶78}** Appellants' third assignment of error alleges:

"The trial court erred when it allowed the jury to consider Plaintiff's claims for fraudulent transfer."

**{¶79}** While recognizing the Uniform Fraudulent Transfer Act (UFTA) provides a right of action against subsequent transferees, Appellants argue Mateo Inc. was not a creditor and APM was not a debtor because Mateo Inc. had no "claim" to the money received by Appellants as the term is used in the UFTA. They argue only the partnership act governs the remaining distributions or contributions, citing R.C. 1776.41(B) (equal share of profits with losses proportionately charged) and 1776.67(A)-(C) (contributions from partners for charges and payments to *creditors* before distributions on dissolution). It is urged the right to payment of a partnership distribution (due to an ownership interest) is not a debt of the partnership. Appellants say it is a question of first impression in Ohio as to whether an ownership interest in a partnership with a (lost) right to the payment of distributions qualifies as a "right to payment" under the UFTA. They cite federal and out-

of-state cases they say support their position. Appellants conclude the court should have directed verdict in their favor; they moved for directed verdict on fraudulent transfer by saying they adopted the arguments made by counsel for Mrs. Proia on this claim. (Tr. 732).

**{¶80}** In response, Mateo Inc. also cites the partnership statutes and points out all partners are jointly and severally liable for all partnership obligations under R.C. 1776.36(A) and one partner can maintain action against the other partner for relief as to partnership business under R.C. 1776.45(B). Mateo Inc. says it qualifies as a creditor of APM (the partnership) and of Appellants, focusing on the qualities of an insider and the fact the statute allows recovery against transferees and subsequent transferees.[3] Mateo Inc. argues its "claim" was not based on its ownership interest in APM but on its ownership interest in half of the money wrongfully paid to the defendants.

**{¶81}** The UFTA provides in pertinent part that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor. R.C. 1336.04(A)(1), (B) (listing badges of fraud used to infer actual intent); (Tr. 1293). In such action, a creditor can obtain various forms of relief including avoidance of the transfer to the extent necessary to satisfy the claim of the creditor. R.C. 1336.07(A)(1). Where the transfer is voidable under R.C. 1336.07(A)(1), the creditor may recover a judgment against the first transferee or the person for whose benefit the transfer was made and any subsequent transferee. R.C. 1336.08(B) (other than a good faith transferee who took for value or their subsequent transferee).

**{¶82}** The UFTA provides a means of collecting on a claim rather than creating a claim or creating creditor status. *Kraft Power Corp. v. Merrill*, 464 Mass. 145, 153-154, 981 N.E.2d 671(2013). Speaking to the effect of other laws, the UFTA provides: "Unless displaced by this chapter, the principles of law and equity, including, but not limited to, the

---

[3] Mateo Inc. also makes an argument on insiders (without explaining why). One of the statutory badges of fraud to determine actual intent asks whether the transfer was to an insider. R.C. 1336.04(B)(1). The definition of insider includes: a corporation of which an individual debtor is a director, officer, or person in control; a director, officer, or person in control of a corporate debtor; a partnership in which a corporate debtor is a general partner (and the other general partners); a general partner in or a person in control of a partnership debtor; a relative of an individual debtor, of a person in control of a partnership debtor, or of a director, officer, or person in control of a corporate debtor; and a managing agent of the debtor. R.C. 1336.01(G). However, Appellants did not raise issues with the badges of fraud.

law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of this chapter." R.C. 1336.10.

{¶83} The UFTA defines a creditor as a person who has a claim, a debtor as a person who is liable on a claim, and a debt as liability on a claim. R.C. 1336.01(D)-(F). A claim is defined as follows: "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." R.C. 1336.01(C). The statute does not only cover contractual claims; an individual possessing a cause of action in tort also qualifies as a creditor. *Stein v. Brown*, 18 Ohio St.3d 305, 308, 480 N.E.2d 1121 (1985) (under the former statute with similar terminology). The definition of claim in R.C. 1336.01(C) matches a definition of "claim" in the bankruptcy code. *See* 11 U.S.C. 101(5)(A).

{¶84} Contrary to a suggestion of Mateo Inc., the right to recover against transferees and subsequent transferees does not relabel those defendants as debtors for application of the statute in the first instance. The question initially involves a transfer made by a debtor that is fraudulent as to a creditor if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor. R.C. 1336.04(A)(1). "[I]t is the debtor's fraud we are considering under R.C. 1336.04(A)(1), not any other person's intent, knowledge or faith." *E. Sav. Bank v. Bucci*, 7th Dist. Mahoning No. 08 MA 28, 2008-Ohio-6363, ¶ 75. The focus is on the transfers from APM, including those transfers alleged to be from APM in the early days (as Appellants claim those payments were from APM being run through Proia Inc.'s books). According to Appellants, the question is whether a partner has a "right to payment" and thus a "claim" against the partnership to make the partner a creditor of the partnership under the UFTA.

{¶85} Appellants cite a case involving the denial of a request for attorney fees in a partnership's bankruptcy case where the attorney argued a partnership interest should be considered a claim of a "creditor" under the bankruptcy code and he was owed fees for his investigation of a "claim" of a general partner who sought distribution of her half of the assets. *In re Riverside-Linden Inv. Co.*, 925 F.2d 320, 323 (9th Cir.1991). Although acknowledging the statutory definition of a claim included a contingent or immature right to payment, the court concluded, "A partnership interest is not a claim." *Id.* It was

reasoned an ownership interest is not a debt of the partnership because partners own the partnership subject to the profits or losses, whereas creditors have claims regardless of the partnership's performance. *Id. See also In re Keenan*, 9th Cir. Bankr.No. 96-00871-MM11 (Feb. 8, 2022) (unreported) (where a partner was the bankruptcy debtor)*, aff'd*, 9th Cir. No. 22-60007 (May 15, 2023).

**{¶86}** Applying this law, a Texas appellate case cited by Appellants held owners of partnership equity interests do not have "creditor" status under the UFTA. *LMP Austin English Aire, LLC v. Lafayette English Apts., LP*, 654 S.W.3d 265, 280-81 (Tx.App.2022) (limited partner's interest is not a partnership debt or claim under UFTA), citing *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 122 (E.D.Pa.2011) (finding equity interests are not debt under the UFTA or the analogous provision in the bankruptcy code and opining true creditors hold claims regardless of the partnership's profits).

**{¶87}** Additionally, Appellants review a Hawaii Supreme Court case rejecting the application of the UFTA by a limited partner who sought the return of a capital contribution. *Schmidt v. HSC, Inc.*, 358 P.3d 727 (Haw.2015). In applying the statutory definition of claim, the court observed: "To hold that a limited partner interest constitutes a debt of the partnership would allow limited partners to receive distributions ahead of even secured creditors." *Id.* at 169. This same court had previously concluded a general partner was not a creditor of the other general partner based on the loss of his capital investment in the general partnership in a suit for fraud and breach of fiduciary duty. *TSA Intern. Ltd. v. Shimizu Corp.*, 990 P.2d 713, 732 (Haw.1999).

**{¶88}** On the other side, the Fifth Circuit addressed a case where a bankruptcy debtor sought to use the UFTA in a related action to enforce her right to distributions and payments as personal property before a limited liability company was dissolved. *In re Galaz*, 765 F.3d 426 (5th Cir.2014). The court explained the plaintiff qualified as a creditor under the UFTA because she had an "economic interest" in a company, citing state statutes providing such an interest was "personal property" and providing the right to share in the income and receive distributions. *Id.* at 433 (the court was already remanding for a de novo review). A federal district court subsequently observed the holding in *Galaz* was more compelling than Hawaii's *TSA* case in finding an ownership interest was "a right to personal property" allowing the plaintiff to qualify as a UFTA creditor. *Global State Invest. USA, Inc. v. LAS Props., LLC*, D.S.C. No. 2:14-CV-4494 (Apr. 29, 2015), fn.5.

Case Nos. 22 MA 0053, 22 MA 0054

{¶89} As Mateo Inc. points out, this is not a suit for the loss of an ownership interest in a partnership or for the return of a capital contribution; nor is it a bankruptcy case. Rather, Mateo Inc. is a partner citing his ownership interest to show he was entitled to a distribution of the profits paid to a transferee within a simultaneous lawsuit against the partner and its owner who performed the transfers. It is recognized a partner who obtains a judgment against a fellow partner or the partnership is a creditor with a claim. An economic interest is defined as "a partner's share of the profits and losses of a partnership and the partner's right to receive distributions." R.C. 1776.01(F). The statutory definition of a UFTA claim as a right to payment is very broad: "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." R.C. 1336.01(C). The "right to payment" means "nothing more nor less than an enforceable obligation." *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

{¶90} Under the circumstances in this case, the trial court did not err in denying Appellants' motion for directed verdict on the fraudulent transfer claim and allowing the jury to consider the application of the UFTA. This assignment of error is overruled. In any event, the damage award against Appellants on the fraudulent claim is mirrored in other claims and is upheld based on our rulings on the other aspects of the case, including the conversion claim, piercing and personal participation, and the "accounting" claim.

## ASSIGNMENT OF ERROR FOUR

{¶91} Appellants' fourth assignment of error states:

"The trial court erred when it allowed Plaintiff-Appellee to amend its complaint during trial."

{¶92} After the close of the plaintiff's evidence, Mrs. Proia's attorney argued there was no notice to the defense that Mateo Inc. would be seeking amounts paid to Mrs. Proia prior to 2006. (Tr. 715). Mateo Inc. responded by asking to amend the complaint to include 2001 to 2005, pointing out the evidence was already presented without objection. (Tr. 720). Appellants adopted some of Mrs. Proia's directed verdict arguments and then specifically moved for directed verdict as to all claims about expenditures from Proia Inc. before 2006, objecting to the mid-trial motion to amend the complaint. They pointed out the 2017 amended complaint specifically cited payment issues starting in 2006, and they

suggested Dr. Mateo was arguing for the first time that he was entitled to payments made by Proia Inc. (Tr. 731-734). In response, Mateo Inc. said the defense was aware the recovery allegations stretched to 2001, pointing to the defense's receipt of the expert report in March 2022. (Tr. 735).

**{¶93}** The court expressed concern over the lack of indication during the plaintiff's case that the defense had any issue with the presentation of evidence on amounts beginning in 2001. (Tr. 736). The court granted a motion to amend the complaint to conform to the trial evidence. (Tr. 736); (12/13/21 J.E.).

**{¶94}** Appellants contend this decision constituted an abuse of discretion, claiming it extended the applicable date range to years prior to those specified in the complaint. Appellants also claim this amendment essentially involved a claim that Dr. Mateo had a personal ownership interest in Proia Inc. even though he was not a party to the suit. Mateo Inc. says this statement misconstrues the evidence. As to the date range, Mateo Inc. argues the issues were tried with consent, pointing to the opening statements and the unobjected to presentation of testimony on the topic. It is urged Appellants failed to seek a continuance for additional discovery under Civ.R. 15(B) or show prejudice, pointing to their receipt of the expert report long before trial and their subsequent deposing of this expert.

**{¶95}** Under Ohio's notice pleading, the complaint must only include "(1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled." Civ.R. 8(A) (without specifying an amount over $25,000, which specific amount can be requested in writing). The rule governing mid-trial amendments to the complaint provides in pertinent part:

> Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. * * *

Civ.R. 15(B) (a failure to so amend does not affect the trial result).

**{¶96}** The rule further states even where "evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits." *Id.* (and the court may grant a continuance if the objecting party needs time to meet such evidence). In those cases, "to justify the exclusion of evidence on the basis of prejudice, the objecting party must satisfy the court that admission of such evidence will put him to serious disadvantage in presenting his case." *Hall v. Bunn*, 11 Ohio St.3d 118, 122, 464 N.E.2d 516 (1984). "Mere surprise is generally rejected as a basis for exclusion. In determining whether surprise actually exists, the extent to which the objecting party had knowledge of the disputed evidence is often considered." *Id.* (considering the discovery on the topic).

**{¶97}** The trial court has broad discretion to freely allow pleadings to be amended under Civ.R. 15(B), and "such discretion will not be disturbed in the absence of 'gross abuse' by the trial court." *Spisak v. McDole*, 15 Ohio St.3d 62, 63, 472 N.E.2d 347 (1984). When determining whether a trial court's decision on amendment was an abuse of discretion, we ask whether it was unreasonable, arbitrary, or unconscionable, not whether it was the same decision we might have made. *West v. Devendra*, 2012-Ohio-6092, 985 N.E.2d 558, ¶ 49 (7th Dist.).

**{¶98}** The amended date range included time during which APM's existence was undisputed. The parties all agreed Dr. Mateo's S corporation, Mateo Inc., was a partner in APM and APM existed since at least the beginning of 2001. Contrary to Appellant's argument that amending the complaint was like adding Dr. Mateo as a party, Dr. Mateo's testimony, read in context, was claiming *Mateo Inc.* bought into the "practice." (Tr. 409, 638). The price was based on the assets of Proia Inc. but not including various personal items and loans involving Dr. Proia's planes and cars, which were on Proia Inc.'s books (as confirmed in the valuation generated by Dr. Proia's accountant in 2000). (Tr. 409-412). In stating they were initially behind in transferring the official books and paperwork from Proia Inc. to APM, Dr. Mateo was explaining (even if inartfully) how they formed the partnership without official books at first, running it under the books of Proia Inc.. (Tr. 536, 594, 600-602). This was confirmed in other testimony and exhibits. For instance,

Case Nos. 22 MA 0053, 22 MA 0054

the defense called as a witness Accountant 1, who stopped practicing in 2003, and he indicated the profits were flowing through Proia Inc. in the early years.

**{¶99}** In any case, the opening statements, including those presented by Appellants, referred to the claims involving payments from Proia Inc. prior to 2006. Without objection, the opening statement of Mateo Inc. spoke of running the partnership under Proia Inc.'s books, Dr. Proia having the partnership pay many of his personal expenses in 2001-2003, and the forensic accounting starting from 2001 to evaluate what was owed to Mateo Inc.

**{¶100}** Appellants' own opening statement recited: Mateo Inc. was formed in 1999 and then entered a joint venture with Proia Inc. before the drafting of a partnership agreement in 2000; the people considered employees of the partnership were paid by Proia Inc. from 2001 to 2007; these employees received retirement plans from 2001 through 2006 (as did Dr. Proia but Dr. Mateo did not); and although they did not find APM tax returns from 2001 or 2003, APM filed a 2002 tax return (which had a discrepancy in the deductions).

**{¶101}** Even more notably, Appellants also announced to the jury: "And the claim is going to be that for '01, '02, and '03, that Dr. Proia showed expenses totaling $505,000 that adversely affected Dr. Mateo." (Tr. 69). "I think you're going to find that the expenses – these '01, '02, '03 – were the expenses of Proia Inc., not the expenses of APM * * *." (Tr. 81). Likewise, while claiming Dr. Proia made less in 2005 than Dr. Mateo, Appellants spoke of defending against Mateo Inc.'s "claim * * * that Dr. Proia got more salary than Dr. Mateo. You will see lined up all of the salaries that each of them had from 2001 through 2016." (Tr. 70).

**{¶102}** Furthermore, there were no objections to the testimony on the payments from 2001-2005 while it was being presented by multiple witnesses during the plaintiff's case. For instance, Mrs. Proia was questioned why a payroll company's records said her salary was paid by APM in 2005. (Tr. 114). The bookkeeping employee testified the salary to Mrs. Proia began on April 25, 2001. (Tr. 164-165). Dr. Proia testified Accountant 1 told him to pay part of his own salary to his wife so she could get a pension. (Tr. 236). Dr. Mateo testified Dr. Proia used partnership funds for his personal expenses from 2001-2006. (Tr. 575).

**{¶103}** Without objection as to the specifics set forth in the complaint, Mateo Inc.'s forensic accounting expert said he evaluated the partnership since it began in 2000 but decided to start with 2001 in calculating the recovery (Tr. 283, 290-309). Explanations about the early years were also elicited from the expert during cross-examination. (Tr. 333, 347, 349, 364-365). Finally, the expert report totaled the damages, including payments during the 2001-2006 timeframe, in a succinct and clear one-page attachment, but there was no objection as to the dates during the testimony on these totals and the defense expert received the report and documents from the date range in order to consider and respond to the claim. (Pl.Ex. 21); (Tr. 952).

**{¶104}** In sum, the trial court reasonably found the issue regarding funds distributed since the beginning of the partnership was tried with implied consent (if not more than implied) and such decision was not arbitrary or unconscionable. Moreover, any claim of surprise need not be believed, considering the discovery conducted in the case. The merits were "subserved" by the amendment to conform to the evidence under Civ.R. 15(B), and the court's exercise of broad discretion under the above-reviewed circumstances of this case reasonably leads to a finding of no prejudice. This assignment of error is overruled.

ASSIGNMENT OF ERROR FIVE

**{¶105}** Appellants' fifth assignment of error contends:

"The trial court erred when it allowed the jury to consider the accounting claim."

**{¶106}** Appellants emphasize the "no adequate remedy at law" statement in Mateo Inc.'s complaint setting forth the claim for "accounting, recoupment, and dissolution." Appellants argue the accounting was an equitable claim. They conclude "equitable claims are not triable as of right to a jury" quoting a case holding a party had no right to a jury trial on an unjust enrichment claim. *Turturice v. AEP Energy Servs., Inc.*, 10th Dist. Franklin No. 06AP-1214, 2008-Ohio-1835, ¶ 20 (finding the trial court empaneled the jury to decide the legal claims and sit in an advisory capacity on the equitable claims).

**{¶107}** Mateo Inc. argues Appellants invited any error by demanding a jury trial in their answer and counterclaim without specifying a limitation on the requested jury trial. Pursuant to Civ.R. 38(C), the jury demand must specify if it does not apply to some issues. This division applies in the context of a jury demand on issues "triable of right by a jury *

* *." Civ.R. 38(B)-(C). "Issues of fact arising in actions for the recovery of money only, or specific real or personal property, shall be tried by a jury, unless a jury trial is waived or unless all parties consent to a reference under the Rules of Civil Procedure." R.C. 2311.04. "All other issues of fact shall be tried by the court, subject to its power to order any issue to be tried by a jury, or referred." *Id.*

{¶108} Part of Mateo Inc.'s accounting claim sought to access the books (to arrive at a figure for damages or winding up); the access occurred during discovery. The initial figures arrived at by both parties were the same. The issues underlying the remaining request for an accounting within the winding up or settlement of accounts claim were factual. In balancing the distributions for winding up, the parties disputed whether the defendants should have benefited from various partnership expenditures and whether the number in the capital account was incorrectly inputted at the time of the initial transfer of the partnership from the books of Proia Inc. The factual issues were not of the type typically reserved for the realm of a trial judge's equitable discretion. The jury was instructed on partnership law and the legal requirements of dissolution and winding up, which would apply once they decided the factual questions. A factual finding on each issue corresponded to a certain contribution figure. Notably, the counterclaim also asked for an accounting to facilitate the equalization of past payments and thereby settle the accounts during the winding up. The lawsuit was filed in 2017, and Appellants do not cite to any request for the trial judge to proceed with some type of pretrial equitable accounting in the years the case was pending.

{¶109} Mateo Inc. also quotes: "In all actions not triable of right by a jury (1) the court upon motion or on its own initiative may try any issue with an advisory jury or (2) the court, with the consent of both parties, may order a trial of any issue with a jury, whose verdict has the same effect as if trial by jury had been a matter of right." Civ.R. 39(C). In saying they did not consent to a jury, Appellants' brief cites to an objection set forth by the attorney for Mrs. Proia, who is not one of the Appellants. (Tr. 1263). We nevertheless recognize, in objecting to jury instructions, counsel for Appellants argued, "I think the winding up of the partnership business is done by the court not by the jury." (Tr. 1261). Still, there was no specific reference to the accounting at that point.

{¶110} After continuing with general arguments about the instructions on the tort claims, Appellants began discussing the proposed interrogatories stating: "The only

claims that are presented are these claims for an accounting. Those are not items to be recovered under a tort claim. Those are items only to be recovered under the, the statutes regarding winding up, which can – that also leads me" (and instead of arguing the accounting was not a claim for a jury or could only be conducted by the court, counsel referred to an objection made during Mateo Inc.'s closing rebuttal). (Tr. 1261-1262). In reviewing the rebuttal, we note there is an objection unrelated to whether the accounting numbers would be determined by the jury; when Mateo Inc. told the jury what amount to put in the accounting interrogatory "because that is the truth," the court overruled a general objection noting the statement was mere argument. (Tr. 1244-1245).

{¶111} Earlier, Appellants made confusing arguments while seeming to acknowledge the jury would be ruling on the "accounting" claim. In moving for a directed verdict on the tort claims and arguing there were no damages above those sought on the wind up and accounting, Appellants argued: "You let this go to the jury, it's mere speculation on their part; the accounting part portion, the wind-up portion. However you like to refer to it, that's fine. We have a go at that. The jury is going to decide it. But all these other claims with Mateo Inc. * * * as the plaintiff, they had no basis." (Tr. 1160-1161, 1164). In the midst of other vague arguments here and later, this suggests consent or acknowledgement the jury would be ruling on the accounting claim.

{¶112} Moreover, Appellants' opening statement acknowledged there was a mistake with Mrs. Proia that needed to be corrected but Dr. Mateo would still owe money after accounting for this amount. (Tr. 81-82). Encouraging the jury to grant recovery in their favor, they said their counterclaim would show Dr. Mateo received more than Dr. Proia in distributions. (Tr. 80-81). Similarly, the opening of counsel for Mrs. Proia (in speaking of mistaken salary and pension payments to her from APM) said "we want you to make sure it gets accounted for out of the accounting between Mateo Inc. and Proia Inc. * * *." (Tr. 86-87).

{¶113} Appellants' closing argument suggested how the jury should make its calculations for the accounting recovery and asked the jury to fill in the certain amount in the verdict they believed Mateo Inc. owed under Proia Inc.'s counterclaim. (Tr. 1211-1216). In asking the jury to find in their favor on the accounting, they concluded: "the right verdict, the fair verdict, is to decide the wind up, the accounting. Do that. * * * They get their money under the accountant, under the accounting." (Tr. 1216, 1219).

**{¶114}** It was only after all this that Appellants made a comment about the court rather than the jury winding up the partnership, which they now say preserved this assignment of error (wherein they seem to suggest the jury's verdict should not be relevant to the accounting). However, to the extent Appellants' argument (during the objections to jury instructions) conveyed a request for the court to perform the accounting, the judge could reasonably find Appellants' consented to have the jury try the factual issues underlying the accounting based on the prior occurrences throughout the case.

**{¶115}** Regardless, Appellant's own jury demand (in their counterclaim for an accounting) did not specify it applied to only some issues under Civ.R. 38(C), and the factual issues were properly submitted to the jury under R.C. 2311.04. Moreover, a court's entry of judgment on a verdict essentially fulfills the court's remaining function in an accounting after the jury determines the fact issues. For instance, the Supreme Court of Utah has observed that factual issues (such as ownership interests in a company) can be presented to the jury even if a parallel equitable issue such as an accounting would turn on the same facts. *OLP, L.L.C. v. Burningham*, 225 P.3d 177, ¶ 26 (Utah 2009). "[F]ollowing the jury's determination that the members had fifty-fifty ownership of the company, there was no need for the court to perform a separate accounting. The jury's factual determination was binding." *Id.* For the various reasons herein set forth, this assignment of error is overruled.

## ASSIGNMENT OF ERROR SIX

**{¶116}** Appellants' sixth assignment of error alleges:

"The trial court erred when it allowed the jury to consider awarding interest in this case."

**{¶117}** Mateo Inc.'s expert testified his damage calculation included $830,457 in interest. Appellants objected to "any reference to interest * * * involving *the tort* claims." (Emphasis added.) The court overruled the objection, and Appellants noted a continuing objection "on the interest issue" to avoid interrupting this testimony. (Tr. 291, 296). In the general verdict, the jury set forth an amount approaching the total amount set forth by the expert, including interest. Interrogatory answers showed the jury found the same recovery was warranted on the accounting claim and each tort claim. Appellants now contend Mateo Inc. was not entitled to interest on *any* claim.

**{¶118}** As for the torts, Appellants point out the prejudgment interest statute says a tort plaintiff is only entitled to prejudgment interest if he contends the defendant failed to make a good faith effort to settle. R.C. 1343.03(B) (post-judgment interest, except as provided in subsequent divisions), (C) (on motion, if the court determines at a hearing held subsequent to the verdict that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case, with instructions on the applicable time period for the computation). Appellants say Mateo Inc. could not recover prejudgment interest because there was no assertion made about a failure to make a good faith effort to settle. Appellants argue there is no right to prejudgment interest on a tort outside of this statute.

**{¶119}** The Supreme Court has recognized the right to prejudgment interest existed at common law while also stating the statute makes the good faith settlement aspect a question "for the court—not any longer a jury." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 658, 635 N.E.2d 331 (1994). Still, some courts have ruled the prejudgment interest statute does not preempt the well-established common law exception allowing prejudgment interest on a conversion claim as part of the compensatory damages award. *See, e.g., Cugini & Capoccia Builders, Inc. v. Ciminello's, Inc.*, 10th Dist. Franklin No. 06AP-210, 2006-Ohio-5787, ¶ 27-31, citing R.C. 1343.03(D) (exception if a different period for computing interest is specified by law); *Masterson v. Weaver*, 5th Dist. Morgan No. CA-05-014, 2006-Ohio-1069, ¶ 49-52. *See also Melone v. Home Sav. & Loan Co.*, 7th Dist. Mahoning No. 99-CA-269, 2001-Ohio-3341 (upholding the trial court's use of lost interest in a conversion action to reflect as an aspect of compensatory damages rather than statutory prejudgment interest).

**{¶120}** It is also noted that consistent with the general waiver doctrine, the jury can consider the issue of interest by the implied consent of the parties. *See generally Hallman v. Zipperer-Davis*, 1st Dist. Hamilton No. C-140589, 2015-Ohio-2345, ¶ 6-12. After the limited objection made during the expert's testimony, Appellants did not thereafter object to the jury considering interest as part of the tort award. A continuing objection during a witness's testimony does not apply through closing arguments and jury instructions.

**{¶121}** For instance, during the admission of exhibits, there was no pertinent objection to Plaintiff's Exhibit 19 (the expert's binder, which Appellants merely asked to be submitted without highlighter) or 21 (the total damage calculation within the binder, which Appellants noted was repetitive and thus asked for withdrawal of the large poster version). (Tr. 669-673). During its closing arguments, Mateo Inc. asked for insertion of the full amount on each claim without objection. (Tr. 1179, 1245). Although not cited by Appellants, we note a general objection was made during closing arguments after Mateo Inc. claimed the defendants did not dispute Mateo Inc. was entitled to immediate possession of the money paid to Mrs. Proia and said it was entitled to $1,901,002 (which was the damage total set forth by the expert). However, this objection was non-specific and referred to future jury instructions on an unnamed issue. (Tr. 1188).

**{¶122}** During Appellants' objections to the jury instructions, there was no argument about interest or reference to the principles in the statute now cited. (Tr. 1260-1262). Had the specific issue been raised to the trial court at that time and an instruction been given to exclude interest from any damage award on the tort claims, Mateo Inc. may have filed a timely post-trial motion under the tort statute (but had no need to file one where they already received their interest).

**{¶123}** In any event, Mateo Inc.'s response brief emphasizes its recovery of the same total damage amount set forth by the expert on the accounting claim (as confirmed by interrogatory). Realizing this, Appellants additionally argue there is no authority for interest on an accounting. Yet, Appellants never raised the unavailability of interest on the accounting claim to the trial court. As set forth before, they objected to the expert's testimony on interest *as it specifically related to the tort claims*. Nevertheless, even as to that objection, they did not thereafter seek a limiting instruction that prejudgment interest was unavailable on the tort claims or direct the court to the principles in the prejudgment interest statute, even upon hearing Mateo Inc. ask the jury for the same amount on the accounting and the tort claims.

**{¶124}** The court provided jury instructions on partnership obligations including contribution, winding up, and the settlement of accounts. "On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Civ.R. 51(A). When generally arguing, "I think the winding

up of the partnership business is done by the court not by the jury," Appellants did not mention interest or contend the legal principles in the partnership instructions were incorrectly stated. (Tr. 1261). Specifically, the jury was instructed: any surplus in APM's assets shall be applied to pay the partners their right to distributions; profits shall be credited to the partners' accounts in settling the accounts; a partner shall contribute to APM an amount equal to the excess of charges over credits; and a "payment or advance made to a partner in excess of that partners' share of APM's profits constitutes a loan to APM that accrues interest from the date of the payment or advance." (Tr. 1283-1284). This would seem to have authorized interest from the date profits were paid in excess of Proia Inc.'s share. Appellants do not discuss these jury instructions on appeal or the rates (per dates) utilized by the expert.

{¶125} Furthermore, and somewhat related to this instruction, Mateo Inc.'s response brief relies on division (A) of the prejudgment interest statute, which "automatically" provides for prejudgment interest "when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account * * * upon all verbal contracts entered into * * *." R.C. 1343.03(A), citing R.C. 5703.47 (for the interest rate of the federal short-term rate). *See also* R.C. 1776.04(A) ("the principles of law and equity supplement this chapter"). It is noted in allowing prejudgment interest under R.C. 1343.03(A), "a court need only ask one question: Has the aggrieved party been fully compensated?" *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 116, 652 N.E.2d 687 (1995). It is also noted Appellants do not say the expert's calculation varied from the statutory rate in Mateo Inc.'s favor.

{¶126} Appellants' reply says this concept does not apply because Mateo Inc. did not "press" the breach of contract claim at trial and thus did not prevail on it; a footnote in a different section of their main brief similarly said Mateo Inc. "abandoned" the breach of contract claim by failing to submit a specific jury instruction on breach of contract. Still, as discussed in other sections of this opinion, the jury was provided instructions explaining the laws covering Ohio's default partnership terms encompassing these

partners' duties and was essentially asked to determine whether one partner received more than their 50% share contrary to those terms.[4]

**{¶127}** Regardless and additionally, a "book account" is generally defined as the "detailed statement of debits and credits giving a history of an enterprise's business transactions." *Black's Law Dictionary* (11th ed. 2019). The verdict on the accounting (which the parties variously called a claim for accounting, winding up, dissolution, contribution, settlement of accounts, or recoupment) involved the settlement of the partnership's accounts.

**{¶128}** Contrary to Appellants' specific arguments, we find prejudgment interest was *recoverable* in this case. Under division (A) of R.C. 1343.03 and the implications of waiver, the arguments briefed under this assignment of error are overruled

## ASSIGNMENT OF ERROR SEVEN

**{¶129}** Appellants' seventh assignment of error argues:

"There was insufficient evidence to support the jury's decision to pierce the corporate veil and impose personal liability on Dr. Proia for the acts of Proia Inc."

**{¶130}** The jury concluded both Proia Inc. and Dr. Proia were liable to Mateo Inc. Through interrogatories, the jury found the elements for piercing of the corporate veil were satisfied. Dr. Proia was the sole shareholder, director, and officer of Proia Inc., the company that was Mateo Inc.'s partner in APM. Appellants point out on the fraud claim, the jury was instructed that an element required Mateo Inc. to be justified in relying on the concealment, and an interrogatory answer found this element lacking. From this, Appellants conclude Mateo Inc. did not present evidence on the second piercing element, stating there was no "fraud or illegal act" committed against Mateo Inc.

**{¶131}** Appellants set forth the following three-prong test set forth in *Belvedere* for piercing the corporate veil: "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong."

---

[4] The defense likewise did not propose instructions on the elements of their counterclaim beyond their request for a settlement of accounts. We also note as to the payments to Mrs. Proia, there were stipulations admitting her salary and retirement should not have been paid by APM.

Case Nos. 22 MA 0053, 22 MA 0054

*Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 275, 617 N.E.2d 1075 (1993), paragraph three of the syllabus.

**{¶132}** As Mateo Inc. responds, the second element was subsequently modified. *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538. The Supreme Court refused to adopt an extremely broad interpretation of the second element to include "a fraud, illegal, or other unjust or inequitable act upon the person seeking to disregard the corporate entity." *Id.* at ¶ 22-27. Nevertheless, the Court *did specifically expand the second element* after finding it provided "too limited [protection] from the wide variety of egregious shareholder misdeeds that may occur." *Id.* at ¶ 28.

> Limiting piercing to cases of fraud or illegal acts * * * insulates shareholders when they abuse the corporate form to commit acts that are as objectionable as fraud or illegality. In view of the reality that shareholders could seriously misuse the corporate form and evade personal liability under the second prong as presently worded, we find it necessary to modify the second prong of the *Belvedere* test to allow for piercing in the event that egregious wrongs are committed by shareholders.

*Id.* Accordingly, the Court declared, "to fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." *Id.* at ¶ 29 (concluding insurer bad faith was a basic example of unjust conduct and "did not represent the type of exceptional wrong that piercing is designed to remedy").

**{¶133}** A judgment on a specific fraud claim is not required to satisfy the second element of the piercing test. *U.S. Bank Natl. Assn. v. MMCO, L.L.C.*, 2021-Ohio-4605, 183 N.E.3d 499, ¶ 80 (8th Dist.), citing *Longo Construction, Inc. v. ASAP Tech. Servs.*, 140 Ohio App.3d 665, 672, 748 N.E.2d 1164 (8th Dist.2000) (fraudulent conduct to satisfy the second piercing element is determined separately from an independent claim for fraud). Moreover, evidence surrounding a conversion can lead to piercing. *See Jack F. Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. Lake No. 2012-L-145, 2014-Ohio-2875.

**{¶134}** Mateo Inc. says Dr. Proia also exercised complete alter-ego control over Proia Inc. in such a manner to commit the unlawful acts constituting tax evasion and injury

or unjust loss resulted to Mateo Inc. from such control and wrong. Besides reciting examples relevant to first element's control (Dr. Proia using Proia Inc. to commit tax evasive behavior regarding cars and children), Mateo Inc. also points to Proia Inc.'s understating of money received from the partnership by using the partnership to convert funds, such as by paying personal expenses and by paying a salary to his wife with retirement (even though she did not work more than the few hours a month for which she was already paid an hourly wage). In other words, Dr. Proia used his complete control to cause Proia Inc. to utilize APM to distribute profits to himself (or his wife in a jointly owned account) instead of to his partner, Mateo Inc., as part of a tax evasion scheme.

{¶135} Appellants' reply states tax violations are not egregious wrongs. They also say such acts are not "committed against" another person just because they may be injured by the scheme.

{¶136} On the latter argument, one could rationally conclude the acts at issue were "committed against" Mateo Inc. (even under the former "committed against" version of the second element), as Mateo Inc. was the partner for whom the settlement of accounts under partnership law was found to be owing. The meaning of "committed against" is not some strict formal victim of crime requirement.

{¶137} In fact, when the second element was modified to cover an additional category of wrongs, this portion of the second element was not maintained. The second element previously spoke of the fraud or illegal act being committed against the piercing party. However, as modified by *Dombroski*, the second element now merely states, "the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act" without maintaining the specific part about committing the act "against" the piercing party. *Dombroski*, 119 Ohio St.3d 506 at ¶ 29, syllabus.

{¶138} The third element remained the same, requiring "injury or unjust loss resulted to the plaintiff from such control and wrong." Appellants do not raise this third (or the first) element, and Dr. Proia's undisputed complete control over Proia Inc. was exercised in such a manner to engage in wrongful conduct that resulted in injury or unjust loss to Mateo Inc., the partner was found to have received much less than half of the partnership profits due to the conduct at issue. The jury was instructed in accordance

with our explanation of the second element as set forth in *Dombroski*, and the instruction is not raised as an issue on appeal. (Tr. 1278).

**{¶139}** This leads to the question of whether the wrongful conduct here rose to the level required by *Dombroski*. Contrary to Appellants' argument, the second piercing element does not only encompass fraud or illegal acts but also includes a catch-all category of "similarly unlawful acts" applicable where other "egregious" conduct is committed by the defendant using their enmeshed control over the entity and where the conduct causes unjust loss to the piercing party. *Dombroski*, 119 Ohio St.3d 506 at ¶ 28-29, syllabus. Sufficient evidence exists if, after construing all evidence and inferences in the light most favorable to Mateo Inc., some rational person could find by a preponderance of the acts rose to the requisite level. *See, e.g., State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998) (sufficiency); *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998) ("any" rational person); *State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999) (reasonable inferences part of sufficiency).[5]

**{¶140}** This case involved more than a simple breach of partnership principles. Some rational person could find the situation was "as objectionable as fraud or illegality." *Dombroski*, 119 Ohio St.3d 506, at ¶ 28. Circumstantial evidence possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Upon reviewing all of the direct and circumstantial evidence and the reasonable implications of such evidence, we conclude reasonable minds could differ as to whether the conduct at issue was egregious, allowing the matter to be submitted to the fact-finder for weighing. *See* Statement of the Case, above.

**{¶141}** Furthermore, Mateo Inc. points out Appellants fail to explain how the judgment would be affected by this piercing challenge where Dr. Proia was personally liable in any event due to his active participation in all acts at issue. "A corporate officer is not liable in a case merely due to his status as a corporate officer * * * However, this protection does not extend to the personal acts and omissions of the corporate officer." *State ex rel. Cordray v. Evergreen Land Dev., Ltd.*, 7th Dist. Mahoning No. 15 MA 0115, 2016-Ohio-7038, ¶ 15. "The personal participation theory of liability is distinct from

---

[5] Weight and sufficiency are distinct concepts in civil law, just as in criminal law, and the criminal law sufficiency test applies to a civil case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 23.

piercing the corporate veil, the alternative theory of liability utilized by the trial court here." *Id.* at ¶ 17, citing *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 2002-Ohio-5194, 778 N.E.2d 80, ¶ 46–47 (7th Dist.) (corporate officer can be jointly and severally liable with corporation where he personally engaged in various transgressions). *Jack F. Neff Sand & Gravel*, 11th Dist. No. 2012-L-145 at ¶ 52.

**{¶142}** "Ohio law has long recognized, however, that a corporate officer may be held personally liable for actions of the corporation if the officer was a participant in the wrongful act." *Disciplinary Counsel v. Nordic Title Agency, Inc., & Hall*, 166 Ohio St.3d 49, 2021-Ohio-2210, 182 N.E.3d 1129, ¶ 19. "When a corporate officer commits a tort while in the performance of his duties, he is individually liable for the wrongful acts," and he "cannot shield himself from liability for the conduct in which he allegedly engaged merely because he engaged in that conduct as a corporate officer." *Yo-Can*, 149 Ohio App. 3d 513 at ¶49. The jury was instructed on this alternative method of personal liability. (Tr. 1279). Although Appellants objected to the jury instruction on personal participation while objecting to the instruction on piercing, they do not discuss the jury instruction or the doctrine on appeal. This assignment of error is overruled.

ASSIGNMENT OF ERROR EIGHT

**{¶143}** Appellant's eighth and final assignment of error claims:

"The trial court erred when it denied Dr. Proia and Proia Inc.'s motion for judgment notwithstanding the verdict under Rule 50(B)."

**{¶144}** Appellants generally argue the trial court should have granted their motion for JNOV because they were entitled to verdicts in their favor on Mateo Inc.'s claims. To support this assignment of error, they refer this court to "all of the reasons addressed above." Mateo Inc. responds by criticizing the lack of substance in this section, stating it is impossible to respond, and asking that we disregard the assignment of error under App.R. 12(A) and App.R. 16(A)(7)-(8). Appellants' reply says they did not intend to raise new issues in this assignment of error but merely intended to rely on the arguments within the prior assignments of error, suggesting those claims of trial error indicate why JNOV was warranted on the same grounds.

**{¶145}** We must point out the JNOV motion did not raise every issue briefed on appeal. For instance, the fraudulent transfer argument in assignment of error three was not in the JNOV motion, and the piercing issue was in a new trial motion rather than the

JNOV motion. To the extent the JNOV motion raised the arguments presented in an assignment of error and we discern a distinct argument as to JNOV, we considered the argument directly or indirectly within the assignment of error. This assignment of error is overruled.

## CONCLUSION

**{¶146}** The eight assignments of error set forth by Appellants (Dr. Proia and Proia Inc.) are overruled. We hereby affirm the portions of the judgment challenged in their appeal.

**{¶147}** The assignment of error set forth in Mateo Inc.'s cross-appeal is overruled in part (as to Mrs. Proia) and sustained in part (as to Dr. Proia and Proia Inc.). We hereby affirm the trial court's judgment eliminating the damages awarded against Cross-Appellee Mrs. Proia. However, we reverse the decision to eliminate this part of the award entered against Appellants. Accordingly, we reinstate the full amount of damages in the jury verdict rendered against Appellants Dr. Proia and Proia Inc.


Hanni, J., concurs.

Trapp, J., concurs.

———————————

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the assignment of error set forth in Mateo Inc.'s cross-appeal is overruled in part and sustained in part.  We hereby affirm the trial court's judgment eliminating the damages awarded against Cross-Appellee.  However, we reverse the decision to eliminate this part of the award entered against Appellants.  Accordingly, we reinstate the full amount of damages in the jury verdict rendered against Appellants. Costs to be taxed equally against the parties.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**